**Zolton FERENCY, Plaintiff,**

v.

**Richard H. AUSTIN, Secretary of State; Bernard Apol, Director, Elections Division, Department of State and Board of State Canvassers, Defendants.**

**No. G80–193 CA5.**

United States District Court,
W. D. Michigan, S. D.

April 21, 1980.

Zolton Ferency, East Lansing, Mich., for plaintiff.

Jann Ryan Baugh, Haywood W. Julian, Asst. Attys. Gen., Lansing, Mich., for defendants.

## OPINION

### INTRODUCTION

DOUGLAS W. HILLMAN, District Judge.

Plaintiff, Zolton Ferency, has filed suit against the Michigan Secretary of State,

the State Director of Elections [1], and the Board of State Canvassers, seeking a declaratory judgment concerning the administration of the Michigan presidential primary election to be held on May 20, 1980. At issue is the constitutionality of the state's election law as it applies to the Democratic Party, and the authority of the state elections officials to supervise party-run caucuses.

Suit was initially filed on March 20, 1980, in Ingham County Circuit Court under the state's Administrative Procedures Act of 1969 (M.C.L.A. § 24.201, et seq.; M.S.A. § 3.560(101), et seq.). That same day, Judge Ray C. Hotchkiss entered an order to show cause why plaintiff's request for a declaratory ruling should not be granted, and a hearing was scheduled for March 26, 1980. On March 25, 1980, the defendants removed the case to this court, and because plaintiff alleged violations of privileges and immunities guaranteed to him by the United States Constitution, jurisdiction was maintained under 28 U.S.C. § 1343(3).[2]

Plaintiff thereafter moved for a declaratory judgment pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 2201. Due to the importance of the questions presented, plaintiff's motion was advanced on the court's calendar and a hearing scheduled for April 11, 1980. By agreement of the parties, the Michigan Democratic Party was permitted to participate in an amicus capacity. At oral argument, all participants agreed that no genuine issue of material fact existed which would preclude a

1. Bernard Apol, Director of the Elections Division of the Department of State, has recently retired.

2. 28 U.S.C. § 1343 reads:
 The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
 (1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;
 (2) To recover damages from any person who fails to prevent or to aid in preventing

any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;
 (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
 (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

prompt decision by this court. For the reasons that follow, I deny plaintiff's motion for declaratory relief, and I accordingly dismiss the case.

## FACTS

In the early part of the Twentieth Century, the movement toward democratization of the presidential nominating process led several states to adopt presidential preference primaries. In 1904, Florida became the first such state to permit this type of election. Others soon followed, so that by 1916, primaries were being conducted in 26 states.

By 1968, this number dwindled to 16, due in large part to the prohibitive costs. Because of the sudden advent of intense media coverage, however, 35 states now employ primary elections as a means of choosing their party delegations. (*See*, Durbin and Seitzinger, *Nomination and Election of the President and Vice President of the United States*, pp. 134–135; U. S. Government Printing Office: 1980.)

Michigan first enacted a presidential primary election law in 1972. Prior to that time, representative delegations were picked in state conventions, and before that, in party caucuses. The presidential primary in Michigan is an open primary in that any individual may vote for the candidates of any party on the ballot. A Republican, a Democratic, a minor party member, or an independent may cast his or her ballot in either the Republican or the Democratic primary without making a prior declaration as to party affiliation. This procedure is known as "cross-over" voting, and is permitted in several other states.

Following the 1976 presidential election, the National Democratic Party reevaluated its support of cross-over voting. This led to a rule change embodied in the Delegate Selection Rules for the 1980 Democratic National Convention (hereinafter "Rules") issued by the Democratic National Committee in 1978. Rule 2A of the Delegation Selection Rules restricts participation in the delegate selection process in primaries or caucuses "to Democratic voters only who publicly declare their party preference and have that preference publicly recorded". Under Rule 2C, state parties which are precluded by state statute from complying with Rule 2A, must adopt and implement an alternative delegate selection system which complies with Party rules. No exemptions are granted (Rule 2B).

On August 18, 1979, the Michigan Democratic Party adopted its 1980 delegate selection plan containing alternative methods for choosing delegates to the national convention. Under the first option, a Michigan delegation would be selected via the Michigan primary election law provided that the state's open-primary features were eliminated prior to October 1, 1980. Failure to amend state law would result in the Party's employment of a second option providing for the establishment of party-run caucuses. Under this plan, participation would be limited solely to Party members who had publicly registered before February 26, 1980. Because the state legislature failed to timely act, the Democratic State Central Committee officially adopted the caucus-alternative on October 13, 1979.

Thereafter, members of the State Senate wrote to the Michigan Attorney General and asked that steps be taken to force the Democratic Party's participation in the state presidential primary. The Attorney General replied on December 6, 1979, informing the legislators that under his reading of recent Supreme Court rulings, state officials were without authority to compel participation in the primary. A second letter to the same effect was sent to the Senate Majority Leader in January, 1980.

On December 10, 1979, Olivia Maynard, the chairperson of the Michigan Democratic Party, informed the Secretary of State that the party would not comply with the rules and requirements of the state's primary election law. Instead, the Democrats informed the Secretary of State that a caucus method would be used to select delegates to the national convention, and moreover, that members of the Democratic Party likely to be listed as candidates on the state's primary election ballot would be requested to

withdraw from competition. In fact, President Carter and Senator Kennedy later withdrew. At this time, only Lyndon H. LaRouche, Jr., and Edmond G. Brown, Jr., are listed as participating candidates.[3]

In January of this year, plaintiff delivered a letter to the Elections Division of the Department of State addressed to the Board of State Canvassers requesting a declaratory ruling concerning, among other things, the propriety of the Secretary of State's refusal to enforce Michigan's presidential primary election law. Specifically, the plaintiff demanded an explanation for the defendants' refusal to comply with M.C.L.A. § 168.620, which reads:

Sec. 620. All rules, procedures, allocation of national delegates, additional qualifications for delegates and delegations of authority, by any state central committee under the provision of this act relating to presidential primary elections, shall be filed with the secretary of state no later than December 31 of the year preceding the presidential election except that in 1972, such rules, procedures, allocation of national delegates, additional qualifications for delegates or delegations of authority shall be filed with the secretary of state no later than the second Friday of March. If the state central committee of any political party, for which a presidential primary is to be held under section 613, fails to file any rules, procedures, allocation of national delegates, additional qualifications for delegates and delegations of authority necessary for the appropriate implementation of this act relating to presidential primary elections, the secretary of state forthwith shall issue them to the extent necessary. The secretary of state shall insure that all such rules, procedures, allocation of national convention delegates,

additional qualifications for delegates, delegations of authority and the general provisions of this act relating to the presidential primary election shall be widely publicized in the mass communications media and made easily available to the public.

Plaintiff was thereafter notified of a hearing on his requested ruling to be held by the Board of State Canvassers on February 7, 1980. Plaintiff attended, submitted a memorandum, and responded to questions propounded by members of the Board. The next day, plaintiff wrote defendants Austin and Apol in order to clarify the fact that he was specifically requesting a ruling on these matters by the Secretary of State's office and by the Elections Division of the Department of State, as well as by the Board of Canvassers. Plaintiff was not informed until February 21, 1980, that the matter was referred to the state's Attorney General.

Although plaintiff had requested an "expeditious" ruling by the defendants, he heard nothing more of the matter. Consequently, as already stated, plaintiff filed suit in state court, which was removed by the defendants to this court on March 25, 1980.

In his complaint and motion for a declaratory judgment, plaintiff requests this court to adjudge and declare that:

(a) under state law (M.C.L.A. § 168.613 [4]), the Democratic Party, because it received greater than 5% of the total vote cast in the last nationwide presidential election, is obligated to participate in the State's presidential primary election to be held May 20, 1980, and to allocate its delegates to the August Democratic National Convention pursuant to that primary election;

(b) under state law (M.C.L.A. § 168.620), the Democratic Party is obligated to file

---

**3.** As of this writing, Governor Brown has publicly stated that he no longer views his candidacy as viable and has consequently terminated his campaign.

**4.** M.C.L.A. § 168.613 reads in part:

"Sec. 613. On the third Tuesday in May, in each presidential election year, a statewide presidential primary election shall be conducted in accordance with this act for each political party that received greater than 5% of the total vote cast nationwide in the last presidential election. In each presidential election year delegates to county conventions shall be elected at the presidential primary election."

with the Secretary of State the rules and procedures which it will use in allocating its delegates to the national convention, and that if the Democratic Party fails to issue these rules by December 31, 1979, as required by law, the Secretary of State is then required to "forthwith" issue his own rules to the extent that they are necessary;

(c) alternatively, if the Democratic Party is in fact not obligated to participate in the state presidential primary election, then under state law (M.C.L.A. § 168.611),[5] the Democrats must participate in and elect their delegates to the national convention by way of a state convention;

(d) alternatively, if in fact the Democratic Party may proceed to elect its delegates by way of party-run caucuses as intended, then it is a violation of state law and of the United States Constitution to restrict participation in the caucuses solely to members of the Democratic Party who have registered and paid party dues prior to February 28, 1980; and

(e) persons who have participated in the Party-run caucuses violate state law by participating in the May primary election.

Defendants respond in two ways. First, they contend that plaintiff lacks standing under the state's Administrative Procedures

Act (hereinafter "APA") and that his standing in this court is premised solely upon the federal Declaratory Judgment Act. They maintain that under the federal Declaratory Judgment Act, they may raise equitable defenses. Consequently, defendants argue that plaintiff's action should be dismissed because a decision by this court would not be in the public's interest, would be futile, and because of laches.

Moreover defendants assert that state election authorities are precluded, under the United States Constitution, from compelling political party participation in state primary elections. They cite as support the recent Supreme Court decision, *Cousins v. Wigoda*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975). Defendants then maintain that because the party caucuses are not elections under state law, the Secretary of State has no authority to supervise or regulate those proceedings. For these reasons, defendants request this court to deny plaintiff's claims for relief.

## DISCUSSION

### I.

▮ Defendants preliminarily question plaintiff Ferency's standing to maintain the

5. M.C.L.A. § 168.611 reads:

Sec. 611. In the year 1956, and each fourth year thereafter, delegates of each political party who were elected to the last prior fall county convention shall reconvene in a county convention. Such county conventions shall, when so convened, elect delegates to a state convention. The number of delegates so elected shall be the same as the number elected to the last prior spring state convention. Said county conventions shall be held at least 90 days prior to the time set for the holding of the national convention of its political party. All county conventions shall be held on the same day and time. The time and place shall be fixed by the state central committee. A state convention shall be held in the year 1956, and each fourth year thereafter, composed of delegates so elected by the respective county conventions which shall be held at least 60 days prior to the holding of the national convention of its political party. On the date and prior to the state convention and at the place designated for the state convention, the delegates so elected by the respective county conventions

shall convene in caucus in congressional districts and the delegates of each congressional district shall elect 2 district delegates to the national convention of its political party, and shall report to the state convention the names of the delegates so elected at each congressional caucus. The time for each of said caucuses shall be designated by the chairman of the state central committee. The state convention shall convene and shall elect the balance of the delegates to the national convention of its political party to which it is entitled under the call of the national convention as delegates-at-large. The convention shall likewise elect presidential electors in the manner now provided by law. Delegates chosen by the respective congressional districts and reported to the convention and delegates-at-large elected at the state convention shall be certified as the state delegation of such political party to its national convention by the chairman and secretary of the state convention. Such county and state conventions shall be conducted in accordance with the law now governing spring and fall county and state conventions.

present action. As already stated, although defendants admit that plaintiff has standing under 28 U.S.C. § 1343(3) to seek a declaratory judgment in this court concerning his federally guaranteed privileges and immunities, they question plaintiff's original standing in state court under the state's APA. Defendants' intent is to limit plaintiff's federal court jurisdiction to the Declaratory Judgment Act, 28 U.S.C. § 2201, where equity defenses such as laches or futility may be raised. *See, Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *American Airlines, Inc. v. Louisville & Jefferson County Air Bd.*, 269 F.2d 811 (6th Cir. 1959).

In January, 1980, plaintiff sought a declaratory ruling from defendants concerning the propriety of their refusal to enforce, against the state Democratic Party, Section 620 of the state's primary election law. Defendants thereafter refused to issue a ruling, based on their conclusion that under Section 63 of the APA [6], issuance of declaratory rulings is a matter within an agency's discretion.

Plaintiff then sought relief in circuit court under Sections 63 and 64 of the Act.[7] Under Section 63, a court is authorized to review a declaratory ruling concerning an agency's administration of a state statute issued by that agency pursuant to a request made by an "interested person". The reviewing court is empowered to set aside or modify the declaratory ruling where the court determines that the agency's decision is arbitrary, unlawful, unsupported by the evidence, or otherwise unwarranted.[8] Under Section 64, an "interested person" is entitled to request a court to adjudge the legitimacy of an agency's previously-promulgated "rule", or the threatened application of a "rule", as that term is defined in Section 7 of the Act.

Defendants admit that the agencies involved failed to issue the declaratory rul-

---

**6.** M.C.L.A. § 24.263 reads:

Sec. 63. On request of an interested person, an agency may issue a declaratory ruling as to the applicability to an actual state of facts of a statute administered by the agency or of a rule or order of the agency. An agency shall prescribe by rule the form for such a request and procedure for its submission, consideration and disposition. A declaratory ruling is binding on the agency and the person requesting it unless it is altered or set aside by any court. An agency may not retroactively change a declaratory ruling, but nothing in this subsection prevents an agency from prospectively changing a declaratory ruling. A declaratory ruling is subject to judicial review in the same manner as an agency final decision or order in a contested case.

**7.** M.C.L.A. § 24.264 reads:

Sec. 64. Unless an exclusive procedure or remedy is provided by a statute governing the agency, the validity or applicability of a rule may be determined in an action for declaratory judgment when the court finds that the rule or its threatened application interferes with or impairs, or imminently threatens to interfere with or impair, the legal rights or privileges of the plaintiff. The action shall be filed in the circuit court of the county where the plaintiff resides or has his principal place of business in this state or in the circuit court for Ingham county. The agency shall be made a party to the action. An action for declaratory judgment may not be commenced under this section unless the

plaintiff has first requested the agency for a declaratory ruling and the agency has denied the request or failed to act upon it expeditiously. This section shall not be construed to prohibit the determination of the validity or applicability of the rule in any other action or proceeding in which its invalidity or inapplicability is asserted.

**8.** A declaratory ruling is subject to review under M.C.L.A. § 24.306, which reads:

106. (1) Except when a statute or the constitution provides for a different scope of review, the court shall hold unlawful and set aside a decision or order of an agency if substantial rights of the petitioner have been prejudiced because the decision or order is any of the following:

(a) In violation of the constitution or a statute.

(b) In excess of the statutory authority or jurisdiction of the agency.

(c) Made upon unlawful procedure resulting in material prejudice to a party.

(d) Not supported by competent, material and substantial evidence on the whole record.

(e) Arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion.

(f) Affected by other substantial and material error of law.

(2) The court, as appropriate, may affirm, reverse or modify the decision or order or remand the case for further proceedings.

ings as requested. For this reason, they argue, plaintiff lacks standing under either Section 63 or Section 64 of the APA because judicial review is available only for agency rules or declaratory rulings, and not for agency refusals to rule. In this regard, however, defendants are mistaken. The state Court of Appeals, in *Human Rights Party v. Michigan Corrections Commission*, 76 Mich.App. 204, 256 N.W.2d 439 (1977), held that under Section 63 of the APA, a reviewing court properly maintains jurisdiction over refusals of agencies to issue declaratory rulings concerning their duties under state statutes. The unanimous panel said at p. 441:

> "In the present case, plaintiffs seek a *declaratory* ruling as to the applicability to an actual state of facts of a statute administered by defendants; specifically, overcrowded prison conditions vis-a-vis statutes concerning prison administration. . . . Defendants, however, refuse to issue any declaratory ruling and the question becomes whether there is judicial review of this refusal. We are of the opinion that there is. Although this is not specifically provided for in the statute, we find that the intent of the Legislature in establishing this declaratory ruling provision is to afford judicial review of an agency's refusal to make any ruling." (Footnote omitted).

Moreover, even if plaintiff did not have standing under Section 63 of the APA, I find that he could premise the court's jurisdiction upon Section 64 based upon the rule laid down in *Michigan Farm Bureau v. Bureau of Workmen's Compensation*, 75 Mich. App. 362, 254 N.W.2d 890 (1977). There, the director of the state's Workmen's Compensation Bureau distributed to self-insured employers statements concerning the director's interpretation of a then-recent Michigan Court of Appeals decision involving the state's Workmen's Compensation Act of 1969. *See, Jolliff v. American Advertising Distributors, Inc.*, 49 Mich.App. 1, 211 N.W. 260 (1973), *lv. den.*, 391 Mich. 780 (1974). In his statement, the director declared that in light of the court's holding, new minimum compensation rates would

apply. The employers then brought suit in circuit court pursuant to Section 64 of the APA challenging the Director's interpretation of the state court's decision. The circuit court held that the Bureau's newly-announced policies did not constitute "rules" under the APA, and thereupon dismissed the action for lack of jurisdiction.

A unanimous Court of Appeals panel reversed. The court held that the Bureau's interpretation of *Jolliff* constituted a "rule" for purposes of the APA because the announcements at issue amounted to new statements of policy which applied the Workmen's Compensation Act in an unprecedented fashion.

Similarly, in the present case, the state Attorney General twice announced that the state's primary election laws would not be enforced against the Democrats due to his interpretation of the Supreme Court decision in *Cousins v. Wigoda, supra*. This situation is identical to that in *Michigan Farm Bureau*, and I therefore find that case to be persuasive.

Defendants' removal of this case from Circuit Court cannot act to deny the plaintiff standing he would otherwise have had under the state's APA. *See*, 14 Wright and Miller, *Federal Practice and Procedure* § 3722 (1976).

II

The substance of plaintiff's complaint concerns the Democratic Party's refusal to participate in the Michigan presidential primary election, as set out in M.C.L.A. § 168.613, *et seq.*, M.S.A. § 6.1613, *et seq.* Plaintiff alleges that the Democratic Party is mandated under Section 613 to participate in the state's primary, and that under Section 620, the Secretary of State has the authority to enforce that participation. For this reason, plaintiff contends that the Secretary of State must compel the Democrats to take part in the upcoming primary election, and to elect national convention delegates pursuant to the Act.

Defendants support their refusal to compel Democratic Party participation by rely-

ing on the case, *Cousins v. Wigoda, supra.* There, defendants maintain, the Supreme Court held that states were precluded from enforcing their election laws where enforcement of those laws would interfere with a political party's paramount right to freedom of association. For this reason, defendants argue, the state in this case is constitutionally prohibited from compelling primary election participation by the Democratic Party because enforcement of the state's election laws would abridge the Party's right to set the requirements and eligibility of its delegates to the National Convention.

Ferency does not agree. Because cross-over voting is not illegal, he argues, the Michigan primary election is not in and of itself illegal or unconstitutional. Moreover, he contends that the Michigan Democratic Party is not precluded from attempting to seat at the National Conventional any delegation it pleases. For this reason, the plaintiff maintains that there is no abridgement of the party's associational interests, as well as no excuse for the defendant Secretary of State's refusal to enforce the state's election laws.

A.

 As the Supreme Court announced in *Kusper v. Pontikes*, 414 U.S. 51, 58, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973), any application of a statute which constitutes a "substantial restraint" or "significant interference" with the exercise of fundamental rights is unconstitutional unless it is necessary to promote some compelling state interest. *See also, NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Bates v. Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). Because fundamental rights guaranteed by the First and Fourteenth Amendments are here involved, i. e., a political party's right to freedom of association, this court is called upon to strictly scrutinize the constitutionality of Michigan's primary election law as it applies to the state Democratic Party.

B.

 As a preliminary matter, the court notes that under state law, national political parties receiving greater than five per cent of the total vote cast in the last nationwide presidential election are compelled to employ the state primary election as the means by which national convention delegates are chosen. (M.C.L.A. § 168.613, M.S.A. § 6.1613). Moreover, Section 618 of the Act makes it indisputable that Democratic Party participation in the state primary would not only be mandatory, but also exclusive. Section 618 reads in part:

"Sec. 618. The allocation of all delegates and alternates to a national convention shall be made by the state central committee of each party *in accordance with the provisions of this act* and shall be certified to the secretary of state . ." (Emphasis added.)

The conclusion that the disputed state election laws are both exclusive and compulsory finds added support in other sections. Section 619, for example, reads in part:

"Sec. 619. (1) National convention delegates *elected pursuant to this act* shall be elected on a basis that insures that the proportion of the total national convention delegation that is uncommitted or is committed to each presidential candidate equals, as near as is practicable, the proportion of the popular vote that was cast as uncommitted or for each respective presidential candidate of the particular political party's total popular vote." (Emphasis added.)

Moreover, under Section 620:

"Sec. 620. All rules, procedures, allocation of national delegates, additional qualifications for delegates and delegations of authority, by any state central committee under the provision of this act relating to presidential primary elections, shall be filed with the secretary of state no later than December 31 of the year preceding the presidential election . ."

Where the state central committee of any political party obliged to participate in the

presidential primary election pursuant to Section 613 fails to file its rules and procedure for the allocation of national delegates under Section 620, the Secretary of State is thereafter empowered to issue them "to the extent necessary" for the appropriate implementation of the primary.

C.

Due to the fact that the state's primary election laws are both mandatory and exclusive as applied to the Democratic Party in this case,[9] this court must interpret their constitutionality in light of *Cousins v. Wigoda, supra.*

In that case, 59 persons from the City of Chicago were elected as uncommitted delegates in the March 1972 Illinois primary to represent the State of Illinois at the 1972 Democratic National Convention (Wigoda Delegation). The Wigoda Delegation was challenged before the Credentials Committee of the National Democratic Party by a second slate of delegates (Cousins Delegation). The Cousins Delegation alleged that the slate-making procedures used in placing the Wigoda Delegation on the Illinois ballot violated the guidelines as set forth in the Report of the Commission of Party Structure and Delegates Selection to the Democratic National Committee, which were thereafter incorporated into Article III, Part I, of the Call of the 1972 Democratic National Convention.

On June 30, 1972, the National Party's Credentials Committee sustained the findings of a party-selected hearings officer and chose to unseat the Wigoda Delegates for violations of Party rules. The Cousins Delegation was seated in their place, having been chosen in June at private caucuses held in Chicago.

Two days before the opening of the Democratic National Convention, the Wigoda Delegates obtained an injunction from the Circuit Court of Cook County, Illinois, enjoining the Cousins Delegation from participating in the Convention. The Cousins Del-

egates appealed that injunction, and meanwhile attended the Convention in violation of the state court's prohibition. On July 10, 1972, the full convention adopted the recommendations of the Credentials Committee and seated the Cousins Delegation, who thereafter voted and otherwise participated in the convention proceedings. In consequence, criminal contempt citations were issued against the Cousins Delegates following their return to Illinois, although adjudication was deferred pending the outcome of the Cousins Delegation's prior appeal.

The Illinois Court of Appeals thereafter upheld the legitimacy of the lower court's injunction, 14 Ill.App.3d 460, 302 N.E.2d 614 (1973), and leave to appeal was denied by the Illinois Supreme Court. In its opinion, the Illinois appellate court said, at page 626, that "(t)he right to sit as a delegate representing Illinois at the national nomination convention is governed exclusively by the Illinois Election Code." The court further stated at pages 625 to 629:

"[A]lthough the purposes and guidelines for reform adopted by the Democratic National Party in its Call for the 1972 Democratic National Convention were issued, they in no way take precedence in the State of Illinois over the Illinois Election Code (Ill.Rev.Stat.1971, ch. 46, § 7–1, *et seq.*). The opening section of Article 7 of the Election Code, which deals with the making of nominations by political parties (§ 7-1), is most clear when in discussing the selection of delegates to National nominating conventions, it states:

'. . . [D]elegates and alternate delegates to National nominating conventions by all political parties . . . shall be made in the manner provided in this Article 7, and not otherwise."

\* \* \* \* \* \*

"Because election to the office of convention delegate in Illinois is governed by non-discriminatory state legislation, the

---

**9.** The Democratic Party received more than 5% of the total vote in the previous nationwide presidential election.

instant case is not merely an intraparty factional dispute to be settled by party discipline. In this case, the law of the state is supreme and party rules to the contrary are of no effect.

\* \* \* \* \* \*

The interest of the state in protecting the effective right to participate in primaries is superior to whatever other interests the party itself might wish to protect . . .

The legislature of the State of Illinois has established election machinery to guarantee the broadest possible citizen and candidate participation in the nomination process by providing for election of delegates to the national conventions. The defendants cannot be permitted to frustrate the state's interest in maximizing that participation. Party rules are not a law unto themselves . . ."

In conclusion, the Illinois court held that enforcement of the previously-issued injunction did not violate the Cousins delegates' right to freedom of association in preventing their participation at the National Convention.

The United States Supreme Court reversed. Rejecting the claim that the State of Illinois retained a compelling state interest in protecting the integrity of its electoral process, the Court said 419 U.S., at 489–490, 95 S.Ct., at 548–549:

"Respondents argue that Illinois had a compelling interest in protecting the integrity of its electoral processes and the right of its citizens under the State and Federal Constitutions to effective suffrage. They rely on the numerous statements of this Court that the right to vote is a 'fundamental political right, because preservative of all rights.' . . . But respondents overlook the significant fact that the suffrage was exercised at the primary election to elect delegates to a National Party Convention. Consideration of the special function of delegates to such a Convention militates persuasively against the conclusion that the asserted interest constitutes a compelling state interest. Delegates perform a task

of supreme importance to every citizen of the Nation regardless of their State of residence . . . The States themselves have no constitutionally mandated role in the great task of the selection of Presidential and Vice-Presidential candidates. If the qualifications and eligibility of delegates to National Political party Conventions were left to state law 'each of the fifty states could establish the qualifications of its delegates to the various party conventions without regard to party policy, an obviously intolerable result.' . . . The Convention serves the pervasive national interest in the selection of candidates for national office, and this national interest is greater than any interest of an individual State." (Footnotes omitted.)

The Court consequently held that because the Party's interest in the qualifications and eligibility of delegates to its national convention was an interest basic to the protected right of political association, "Illinois' interest in protecting the integrity of its electoral process cannot be deemed to be compelling in the context of the selection of delegates to the National Party Convention." 419 U.S., at 477, 95 S.Ct., at 542.

Based on *Cousins v. Wigoda, supra,* I conclude that the Michigan presidential primary statute is unconstitutional as applied to the Democratic Party in this case because the Act attempts to exclusively preempt the Party's delegate selection process. For that reason, defendants are under no duty to enforce its provisions in this case.

The Michigan statute in question clearly conflicts with the rules of the Democratic Party governing delegate selection in that there are no restrictions against "crossover" voting. Under state law, delegates to the National Convention must be selected pursuant to an open primary, contrary to Rule 2A of the Party's Delegate Selection Rules. In its *amicus* brief, the Democratic Party explains, at page 7, that Rule 2A "seeks to ensure that the votes of Republicans and other non-Democrats do not distort the Party's processes for determining Democrats' candidate preferences." This

would appear to be an interest which goes to the very heart of the Party's associational rights. Indeed, there is no interest of greater significance to an association than that of having its leadership selected by its own members.

The National Party considered this right to be so important that it ordered state party central committees, where state law conflicted with Party rules, to erect alternative methods of selecting delegates to the National Convention. No exemptions were permitted. Protection of such crucial interests was surely intended by the Supreme Court in *Cousins v. Wigoda, supra.*

 Moreover, it has long been established that First and Fourteenth Amendment protection of the rights of free speech and assembly gives rise to a constitutional right to associate with others for the common advancement of political beliefs and ideas. *Kusper v. Pontikes, supra,* 414 U.S., at 56, 94 S.Ct., at 307. The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom. *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). The Supreme Court has repeatedly stated that any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents. *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211–1212, 1 L.Ed.2d 1311 (1957); *Cousins v. Wigoda, supra,* 419 U.S., at 487–488, 95 S.Ct., at 547; *Buckley v. Valeo,* 424 U.S. 1, 22 (1976). As a result, the courts have given broad latitude to political parties to enable them to conduct their own affairs and to settle their own disputes without judicial interference. *See, e. g., Ripon Society, Inc. v. National Republican Party,* 525 F.2d 567 (en banc, 1975), *cert. den.* 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976).

On the other hand, *Cousins* does not stand for the proposition that states have no interest in regulating primary elections.

*United States v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). State interests in ensuring the integrity of electoral processes has frequently been treated as significant and compelling. *See, e. g., Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). In this respect, the Supreme Court has said: "Moreover, a State has an interest, if not a duty, to protect the integrities of its political processes from frivolous or fraudulent candidacies." *Bullock v. Carter,* 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92 (1972).

Here, however, essential rights relating to the freedom of association are abridged. Had cross-over voting not been allowed, Michigan's statutory scheme might well have been constitutional. In the context of this case, however, where state law is both mandatory and exclusive, and where legitimate interests of the national party are infringed, Michigan's "compelling interests" wane.

 Political parties play a basic and necessary role in the formation of our national government. To that end, those parties must be permitted to freely define, within the confines of the Constitution, the qualifications of those who are to participate in their basic functions. It is entirely permissible and reasonable for the Democratic Party to decide that only Democrats should vote in primary elections designed to select delegates to a national convention. The Michigan statute does not permit that. For that reason, I find it to be unconstitutional as applied to the Democratic Party in this case.[10]

**D.**

In his complaint, plaintiff seeks a declaration that because the state Democratic Party chose not to honor its obligations under the state's election laws, the defendant Secretary of State is duty-bound to issue, under Section 620, the rules, procedures and other requirements necessary for implementing the primary election.

---

**10.** The court intimates no judgment concerning the constitutionality of the Michigan presidential primary election law as it pertains to the Republican Party or to any other political association. That question is not now before the court, and nothing in this case is intended to suggest that the Michigan law is constitutionally infirm on its face.

Section 620 of the Michigan primary statute directs the state central committee of each political party for which a presidential primary election is to be held to file with the Secretary of State "all rules, procedures, allocation of national delegates, additional qualifications for delegates, and delegations of authority . . ." in connection with the primary. If the committee fails to file such rules, "necessary for the appropriate implementation of this act relating to presidential primary elections", the section directs the Secretary of State to issue them "to the extent necessary".

■ Because the primary law is unconstitutional as applied to the Democratic Party, the Party need not file any rules with the Secretary of State. The Secretary of State, in turn, has not promulgated any rules with respect to the Democratic Party, and he is precluded from doing so to the extent that they define the qualifications and eligibility of delegates to the Democratic National Convention. *Cousins v. Wigoda, supra.*

By its terms, Section 620 invests the Secretary with discretion to determine whether rules and procedures are "necessary". He has properly determined that implementation of the law here would be unconstitutional. I hold, therefore, that the defendant Secretary of State has fulfilled all of his obligations under Section 620, and I accordingly deny this aspect of plaintiff's request for relief.

### III

Ferency alternatively argues that even if the Democratic Party cannot be forced to participate in the Michigan presidential primary election to be held in May, under state law the Secretary of State has the authority to require the Democrats to select their delegates in state and county conventions rather than by caucus. Ferency bases this argument on the existence of M.C.L.A. § 168.611,[11] the statute under which delegates to a national convention were elected prior to 1972.

The *amicus*, at oral argument, expressed concern over whether or not Section 611 would similarly violate the Delegate Selection Rules for the 1980 Democratic National Convention. Specifically, the *amicus* noted that at the time the state Party adopted its 1980 delegate selection plan, Section 611 was thought to have been effectively repealed due to the mandatory nature of the primary election law. Requiring the state Party to now employ the convention method, it is alleged, would contradict Party rules requiring submission and implementation of state delegate selection plans no later than September 15, 1979.[12]

■ The court need not resolve that issue at this time. Instead, for the reasons that follow, I hold that the state Democratic Party cannot be compelled to implement the convention method of picking delegates where the primary election statutes are held not to apply.

In the original 1972 enactment of the presidential primary election law, the state legislature included a provision designed to require minor parties to elect their national convention delegates by way of state conventions held pursuant to Section 611. This section, as embodied in M.C.L.A. § 168.617, read in part as follows:

**11.** See footnote 5.

**12.** Amicus relies on Rule 1B of the Delegate Selection Rules, which reads, in part, as follows:
1. PUBLICATION AND SUBMISSION OF STATE PARTY RULES
 \* \* \* \* \* \*
B. Each State Party shall adopt an Affirmative Action Plan and a Delegate Selection Plan which shall be submitted to the Compliance Review Commission for approval on or before April 15, 1979.\* Such Plans shall be consistent with National Party Rules. The

Affirmative Action Plans shall include provisions for the appointment of a representative State Affirmative Action Committee and for the implementation by Party organizations of Affirmative Action as defined in Rule 6 and Non-Discrimination as defined in Rule 5. In the six (6) months prior to the first step of the delegate selection process, each state Affirmative Action Plan shall give special attention to encouraging participation by the dissemination of information about the delegate selection process. . . .

"Political parties not participating in the presidential primary shall elect their delegates and alternates as provided in Section 611."

In 1975, the state legislature amended the state's presidential primary election law to accommodate inconsistencies created by recently-adopted national party rules.[13] Among the changes incorporated in the amendments was repeal of Section 617. Section 611 was retained.

The legislative analysis accompanying the 1975 amendment expressly discussed the origin of the specific changes made in the primary election law. In each case, the changes made originated from party rules which contradicted existing statutory provisions. However, the repeal of Section 617 was unexplained, suggesting that the legislature's action was unrelated to any conflict over party rules. As a result of this repeal, no clear statements exist concerning the state's interest in supervising delegate selection systems for parties not participating in the primary election.

For this reason, I find that the state legislature did not intend to retain the convention method of selecting delegates as an alternative to a primary election. This is not to say that the legislature is powerless to require party implementation of state conventions. In the present case, however, there is no reason to believe that the state legislature intended Section 611 to be an inviolate alternative. Plaintiff's request

for a declaration that the Michigan Democratic Party is obliged to elect delegates pursuant to Section 611, instead of in party-run caucuses as planned, is consequently denied.

## IV

Plaintiff next contends that even if the Democrats in this case cannot be forced to utilize a state convention or a primary election as a means of choosing their delegates to the Democratic National Convention, the state nevertheless has superintending authority to police the party-run caucuses expected to be held on April 26 and May 3, 1980. Ferency maintains that the caucuses are "elections" under state law which bring them within the purview of the defendants' statutory authority. For this reason, plaintiff requests this court to declare that the rules and procedures which the Democratic Party intends to implement at the upcoming caucuses contradict state law, as well as voters' state and federal constitutional rights. Specifically, plaintiff seeks a ruling that the Democratic Party cannot bar non-Democrats from the caucuses, that they cannot require voters to have enlisted with the Party prior to February 26, 1980, that they cannot permit participation by persons who have not registered to vote in the State of Michigan, and that they cannot require the payment of money (Party dues) as a pre-requisite to voting.[14]

**13.** The State House of Representatives, through its analysis division, in fact expressly supported the amendments as necessary under the then-recent Supreme Court decision in *Cousins v. Wigoda, supra.* The House read *Cousins* as ruling that Party rules take precedence over state election laws. (*See*, Report of the Michigan House of Representatives, Analysis Division concerning S.B. 1196 (unpublished), issued 12/15/75).

**14.** *Amicus* challenges plaintiff's standing to question Party rules relating to the eligibility of voters to participate in the caucuses. *Amicus* argues that there is no "case or controversy" here, as required under Art. III of the United States Constitution, because plaintiff is eligible to vote in the caucuses, and so is not "aggrieved" by the Party rules.

It is no doubt true that plaintiff must be injured by defendants' acts or omissions before

he can claim the right to sue. *See, Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) and this court's opinion in *Kay v. Austin*, 494 F.Supp. 554, (W.D.Mich.1980) (order denying standing). I find, however, that plaintiff here can assert violations of his interests significant enough to warrant standing.

As a member of the Democratic Party intending to vote at the party caucuses, plaintiff can claim an interest in the full value of his ballot. If non-registered voters are permitted to participate in the caucuses, for example, plaintiff's vote is that much diluted.

Moreover, plaintiff is a member of the Executive Board of the Ingham County Democratic Committee, as well as a duly-elected precinct delegate. Plaintiff, therefore, retains an interest, under the state's APA, in ensuring that the caucus procedures he is mandated to enforce

Alternatively, plaintiff alleges that the Democratic State Central Committee is a statutory body established under state law, M.C.L.A. § 168.697; M.S.A. § 6.1597,[15] and that it performs various duties and exercises certain powers related to the state's electoral processes. For this reason, plaintiff contends that action by the Democratic State Central Committee is "state action", including, in this case, the conducting of party-run delegate selection caucuses. Plaintiff consequently requests a declaration by the court that the Secretary of State has authority to supervise these caucuses because they amount to "state action", and for that reason, that the Secretary of State has a duty to prohibit the Democratic Party from enforcing the procedural rules set out above which plaintiff alleges are in violation of state and federal law.

**A.**

Plaintiff first contends that "caucuses" are "elections" under state law. I cannot agree. The term "caucus" remains undefined under state law, and no state statute expressly confers statutory authority upon the Secretary of the State to supervise their implementation. Plaintiff ar-

gues, however, that "caucuses", because they are ultimately used for choosing delegates to national conventions, are really "elections" or "primary elections".

The terms "election" and "primary election" are defined by state law, and the court looks to the sections of the Michigan election law defining those terms for greater clarity. Section 2 of the Act defines "election". It reads:

"Sec. 2. The term 'election', as used in this act, shall mean and be held to include any election and primary election, at which the electors of the state or of any subdivision thereof choose or nominate by ballot public officials or decide any public question lawfully submitted to them. The term 'election' is not synonymous with the term 'civil appointment' as such term appears in section 9 of article 4 of the state constitution."

Although M.C.L.A. § 168.2 does not preclude this court from interpreting the term "caucus" to mean an "election", I am not convinced that the language in Section 2 supports such an interpretation. The state legislature defined election in terms of state electors deciding public questions and

---

under Party rule are not illegal under state or federal law. Plaintiff's request for a declaratory ruling is well within his rights under the Michigan APA and he is permitted to act upon those rights in this court. (See Part I of this opinion, *supra*.)

Moreover, *amicus* is mistaken in relying upon the recent case, *Winpisinger, et al v. Watson, et al*, 628 F.2d 133 (D.C.Cir. 1980). There, plaintiffs sought judicial review of countless executive decisions made by the President and his staff which they allege illegally and adversely affected the Kennedy presidential campaign. Plaintiffs were denied standing in *Winpisinger* because the appellate court concluded, as did the court below, that the plaintiffs were unable to establish a "fairly traceable" causal link between the claimed injury and the challenged conduct. *See, e. g., Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

In the present case, plaintiff is capable of demonstrating a "fairly traceable" causal link. Specifically, plaintiff can show that the refusal of the Secretary to act, if he is so obligated, dilutes the full value of plaintiff's vote and potentially places the State Democratic Party,

of which plaintiff is an officer, in danger of violating state or federal law. Plaintiff merely seeks a ruling by the defendants, and now by this court, concerning the validity of the caucus procedures intended to be used by the Party. Plaintiff has standing to pursue this relief.

**15.** M.C.L.A. § 168.597 reads:

Sec. 597. At its spring state convention in each odd numbered year, each political party shall select a state central committee as herein provided, which committee shall consist of 2 men and 2 women from each congressional district. The state convention shall select a chairman and 2 vice chairmen of the state central committee and such chairman and vice chairmen shall have the right to vote on all questions arising in the committee. The state central committee so constituted shall appoint a secretary and a treasurer and such other officers as in its judgment may be proper and shall have the power to fill any vacancy that may occur in its membership or any of its offices. The term of service of a state central committee shall continue until the election of its successor.

nominating public officials for office. In the caucuses soon to be held by the Democrats, however, members of a private association will meet to pick the candidate best suited to represent their party. While this has "public" implications for the upcoming November election, this is not a "public" question for purposes of Section 2.

Section 7 of the Act defines "primary election". That section reads:

"Sec. 7. The term 'primary' or 'primary election', as used in this act, shall mean a primary election held for the purpose of deciding by ballot who shall be the nominees for the offices named in this act, or for the election by ballot of delegates to political conventions."

Whether or not a "caucus" is a "primary election" under state law is a more difficult question. In the same way that "election" was defined in Section 2, "primary election" is defined in Section 7 by repeating the term in its definition. A "primary election" under state law is a "primary election" held for the purpose of electing candidates to political conventions. There is no reference, however, to "caucus", and that term is notably absent from the statute.

Given the ambiguous nature of the language used in Section 7, it would not be entirely unreasonable to conclude that the state legislature intended to treat caucuses as primary elections. On the other hand, in *Cousins v. Wigoda, supra,* the Supreme Court emphasized the important role state political parties play in the national scheme of electing a president. In that opinion, Justice Brennan expressly stated, 419 U.S., at 498–490, 95 S.Ct., at 548–549:

"(T)he state political parties are 'affiliated with a national party through acceptance of the national call to send state delegates to the national convention.' *Ray v. Blair,* 343 U.S. 214, 225, [72 S.Ct. 654, 659, 96 L.Ed. 894] (1952). The States themselves have no constitutionally mandated role in the great task of the selection of Presidential and Vice-Presidential candidates. . . . The Convention serves the pervasive national interest in the selection of candidates for national office, and this national interest is greater than any interest of an individual State."

Because state parties play such a unique role in the national political process, I am not convinced that state authority to supervise meetings and caucuses of state political associations exists absent an express statement of intent by the legislature. The legislature may freely define "primary election" to include "caucus". In this case, however, it chose not to, even though it was well aware, in October, 1979, that the state Democratic Party intended to elect convention delegates by way of caucus vote. Failure by the state to expressly include "caucus" within the purview of its supervisory authority, along with the Secretary of State's refusal to police the upcoming Democratic Party gatherings, convinces me that the State in this case did not intend to make "caucuses" elections under state law.

Nor do I find *Thorne v. Jones,* 335 Mich. 658, 57 N.W.2d 40 (1953) to be controlling. In that case, a township clerk sought a declaratory ruling concerning the legality of a candidate's running for public office on the ticket of more than one political party. Under one provision of the state's election law, candidates in caucuses were prohibited from running under the auspices of two different political parties. This same prohibition was not included, however, under a provision outlining candidacy requirements in state primary elections.

The Supreme Court of Michigan held that in order to prevent candidates' names from appearing more than once on a primary ballot for a particular public office, a "caucus" would be taken to include a "primary election". In this way, rules prohibiting multiple candidacies in caucus elections would be applied in the same way to candidacies in primary elections.

In *Thorne,* the plaintiff was asking the court to interpret the then-existing state statutes regulating primaries to mean the same as the then-existing state statutes regulating caucuses. Plaintiff requested relief in order to prevent a fraudulent primary election, just as the legislature had

already demonstrated a desire to prevent fraudulent caucus elections. In this case, however, no state statute currently exists which attempts to regulate caucuses. Also, the legislature has not demonstrated in any way a desire to supervise caucus elections of the type currently before the court. Unlike *Thorne*, plaintiff here is not asking this court to interpret statutes relating to caucuses so that fraud will be prevented. Plaintiff instead requests this court to interpret state regulation of primary elections to permit the Secretary of State to supervise an area (caucuses) the legislature itself has not seen fit to regulate. This is an entirely different question from that involved in *Thorne*. For that reason, I find the case to be distinguishable.

B.

█ Whether decisions and actions of political parties in selecting delegates to their national conventions amount to "state action" is a question expressly reserved by the Supreme Court in *Cousins v. Wigoda, supra*, 419 U.S., at 483 n.4, 95 S.Ct., at 545. In the case now at hand, however, this court is directly faced with that issue. Given the present set of circumstances, and for the reasons that follow, I conclude that the state Democratic Party's implementation of party caucuses is not "state action", and I deny plaintiff's request for declaratory relief.

Preliminarily, it is important to note that the court is not faced here with the situations involved in other cases where delegate selection processes were said to involve "state action". *See, Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed.2d 987 (1944); *United States v. Classic, supra*. In those cases, the state authorities had actively and directly conducted or regulated the delegate selection

processes in primary elections pursuant to property-enacted state legislation. Here, however, the Democratic State Central Committee has decided to implement caucus-selection systems in seeming contradiction to state law, and without the approval or imprimatur of state officials.

The Democratic Party's actions in this case are purely private activities. The state is not conducting or regulating these party caucuses, nor is the party acting pursuant to or on behalf of the state. This court has already determined that no state statute exists which governs the holding of party caucuses. No reason exists to conclude under the facts of this case that the Democratic Party in this case is acting as an arm of the state.

In addition, I agree with the statement of the court in *Graham v. Fong Eu*, 403 F.Supp. 37, 44 (N.D.Cal.1975), *aff'd* 423 U.S. 1067, 96 S.Ct. 851, 47 L.Ed.2d 80 (1976), where it said:

> "The Constitution does not require that voters be afforded an opportunity to participate at either final or preliminary stages in the nomination process for presidential candidates. Whether the voters will participate in the delegate selection process, and, if so, at what stage, and whether their participation will be translated directly into delegate representation at the national convention are matters for the political parties themselves to determine, and, if the parties permit it, for the state." (Footnotes omitted.)

Given the clear absence of direct state involvement, I find that the activities of the Michigan Democratic Party, relative to the upcoming party caucuses, to be political activity unrelated to state regulations. For this reason, I find that the upcoming caucuses are not "state action" for purposes of plaintiff's complaint.[16]

---

16. Nor do I believe that just because the Democratic State Central Committee exists pursuant to state law (M.C.L.A. § 168.597), "state action" necessarily exists. In *Marchioro v. Chaney*, 442 U.S. 191, 99 S.Ct. 2243, 60 L.Ed.2d 816 (1978), the Supreme Court upheld as constitutional a state statute requiring political parties to have state central committees, even where a party resists that requirement. The statutorily required existence of a political party's central committee, therefore, is not necessarily relevant to the party's intent to operate as an arm of the state, or the legislature's right to make that party's acts "state action".

C.

█ Plaintiff has not shown that the state party caucuses are either "elections" or "state action" under state law. I conclude, therefore, that the Secretary of State has no authority under state law to supervise the implementation of party caucuses. The Secretary of State has authority to administer the election laws of the State of Michigan.[17] He does not have the authority to supervise or administer "election" processes of purely private associations. For this reason, I deny plaintiff's request for a declaratory ruling concerning the legality and constitutionality of eligibility requirements for participation in the party caucuses.

V

Ferency lastly requests a ruling by this court that persons voting in the upcoming party caucuses are prohibited from then voting in the May primary election. He bases this claim on M.C.L.A. § 168.931(j), which reads:

"(j) No person shall offer or attempt to vote more than once at the same election either in the same or in another voting precinct, nor shall he give two or more votes folded together."

█ Plaintiff misconstrues Section 931(j) because, on its face, it prohibits double-voting in the "same election". Since caucuses are not elections under state law, there can be no violation of Section 931. Plaintiff's claim for relief is consequently denied.

VI

For the reasons set out above, plaintiff's motion for declaratory relief is denied. Accordingly, plaintiff's complaint is dismissed.

17. This authority arises under M.C.L.A. § 168.-31:

> Sec. 31. The secretary of state in addition to other powers and duties conferred upon him shall have the power and it shall be his duty:
>
> (1) **Rules, regulations and instructions.** To prepare rules, regulations and instructions for the conduct of elections and registrations in accordance with the laws of the state;
>
> (2) **Advice to local election officials.** To advise local election officials upon request as to the proper methods of conducting elections;
>
> (3) **Manual of instructions.** To publish and furnish for the use in each election precinct prior to each state primary and election a manual of instructions;
>
> (4) **Pamphlet copies of registration, primary and election laws; distribution.** To publish indexed pamphlet copies of the registration, primary and election laws and to furnish to the various county, city, township and village clerks a sufficient number of copies for their own use and to enable them to include 1 copy with the election supplies furnished each precinct board of election inspectors under their respective jurisdictions, and he may furnish single copies of the publications to organizations or individuals who request the same for purposes of instruction or public reference;
>
> (5) **Forms, notices and supplies.** To prescribe and require such uniform forms, notices and supplies as he shall deem advisable for use in the conduct of elections and regulations;
>
> (6) **Form of ballot; amendment to constitution, initiative, referendum.** To prepare the form of ballot for any proposed amendment to the constitution or proposal under the initiative or referendum provision of the constitution to be submitted to the voters of the state;
>
> (7) **Reports from local election officials.** To require such reports from the local election officials as may be deemed necessary;
>
> (8) **Investigation and report of election law violations.** To investigate, or cause to be investigated by local authorities, the administration of election laws, and to report violations of the election laws and regulations to the attorney general or prosecuting attorney, or both, for prosecution; and
>
> (9) **Legislative manual, publication of votes, further information.** To publish in the legislative manual the vote for governor and secretary of state by townships and wards and the vote for members of the state legislature cast at the preceding November election, which shall be returned to the secretary of state by the several county clerks on or before the first day of December following such election, and it shall be the further duty of all clerks to furnish to the secretary of state, promptly and without compensation, any further information requested of them, to be used in the compilation of the manual.